UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REBECCA FILTHAUT,

Plaintiff,

v.

AT&T MIDWEST DISABILITY BENEFIT PLAN and AT&T UMBRELLA BENEFIT PLAN NO. 3,

Defendant.

Case No. 15-cv-12872

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
MONA K. MAJZOUB

**OPINION AND ORDER: (I) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [21] AS TO CLAIMS NOS. 2 AND 3 AND DENYING PLAINTIFF'S MOTION FOR JUDGEMENT AS TO CLAIM NO. 1; (II) GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD [20] WITH RESPECT TO CLAIM NO.1 AND DENYING DEFENDANT'S MOTION AS TO CLAIMS NOS. 2 AND 3**

### I. INTRODUCTION

This is an Employee Retirement Income Security Act ("ERISA") case, arising under 29 U.S.C. § 1132(a)(1)(B). Rebecca Filthaut ("Plaintiff") filed a complaint on August 13, 2015 against AT&T Umbrella Benefit Plan No. 3 ("the Plan" or "Defendant"). Plaintiff alleges that the Plan wrongfully denied her short-term disability benefits during three different periods between January and May 2014. The Plan alleges that the Plaintiff failed to present sufficient documentation to establish that she was disabled.

-1-

Before the Court is Defendant's Motion for Judgment on the Administrative Record [20] and Plaintiff's Motion for Summary Judgment Granting Plaintiff Short-Term Disability Benefits [21]. Each motion has been responded to by the opposing party. Reply briefs have not been filed on either Motion. Upon review of both motions, the Court finds that oral argument will not aid in the disposition of this matter. Accordingly, the hearing is cancelled and the Court will decide the matter on the submitted brief. *See* E.D. Mich. L.R. 7.1(f)(2). For the reasons discussed herein, the Court will **GRANT** the Plaintiff's Motion **IN PART**, and **GRANT** the Defendant's Motion **IN PART**.

## II. FACTUAL BACKGROUND

Plaintiff is a female service representative with the Michigan Bell Telephone Company. ECF No. 17-1 at 141 (Pg. ID 191); ECF No. 20 at 11 (Pg. ID 1285). She participated in the AT&T Midwest Disability Benefit Program, which is a component of the Plan. ECF No. 7 at 2–3. Though housed within AT&T, disability benefits are administered by Sedgwick Claim Management Service, Inc. ("Sedgwick"). ECF No. 20 at 10–12 (Pg. ID 1284–86). The Plan provides both short-term and long-term benefits if participants meet the Plan's definition of disabled:

> "[i]f the Claims Administrator determines that you are Disabled by reason of sickness, pregnancy, or an off-the job illness or injury that prevents you from performing the duties of your job (or any other job assigned by the Company for which you are qualified) with or without reasonable accommodation. Your Disability must be supported by objective Medical Evidence."

*Id.* The Plan defines objective Medical Evidence as:

> "Objective medical information sufficient to show that the Participant is Disabled, as determined at the sole discretion of the Claims Administrator. Objective medical information includes, but is not limited to, results from diagnostic tools and examinations performed in accordance with the generally accepted principles of the health care profession. In general, a diagnosis that is based largely or entirely on self-reported symptoms will not be considered sufficient to support a finding of Disability."

*Id.*

In response to kidney issues and chronic back pain that had been ongoing since at least 2012, Plaintiff applied for short-term disability benefits. ECF No. 17-4 at 57 (Pg. ID 532). The Plan granted benefits to the Plaintiff from December 2013 to early January 2014. ECF No. 20 at 13 (Pg. ID 1287). Amid continued pain and discomfort, Plaintiff made three additional claims for short-term disability benefits: January 13 to February 23, 2014 ("Claim No. 1"), March 3 to April 14, 2014 ("Claim No. 2"), and April 16 to May 7, 2014 ('Claim No. 3"). The Plan denied disability benefits on all three claims. *Id.* at 2 (Pg. ID 1276). According to the Plan, the Defendant did not provide sufficient medical evidence that she was unable to perform her sedentary job. *Id.* at 28–32 (Pg. ID 1302–06).

Throughout the relevant period, the Plaintiff consulted at least three treating physicians: Drs. Al Nouri, Kovar and Carley. Dr. Al Nouri diagnosed the Plaintiff with lumbar degenerative disc disease and administered a series of steroid injections. ECF No. 17-1 at 149 (Pg. ID 199). The injections did not successfully control the

Plaintiff's pain. *Id.* Dr. Kovar, a neurologist, determined the Plaintiff suffered from a myofascial strain near her ribs and multiple segmental somatic dysfunction throughout the Plaintiff's thoracic region. ECF No. 17-2 at 18 (Pg. ID 240).

Dr. Carley, a family care physician, is the most important doctor to Plaintiff's claims. On March 5, 2014, Dr. Carley's observed clinical findings noted that the Plaintiff was "unable to ambulate". ECF No. 17-5 at 96 (Pg. ID 637). Dr. Carley recommended "no work" as a functional restriction. *Id.* On March 11, 2014, Dr. Carley indicated that if Plaintiff returned to work, she would require the following restrictions: breaks every five minutes, no sitting or standing for more than five minutes, no lifting over two pounds, no reaching over-head, no bending, no twisting, no kneeling, and no stooping. ECF No. 18-4 at 52–54 (Pg. ID 1139–41). Dr. Carley recommended these limitations for no more than six months. *Id.* The Plaintiff submitted medical information from all three treating physicians to the Plan.

After Plan participants supply medical evidence of a disability, the Plan contacts physician advisors, who are hired specialists, to make an independent disability determination. Generally, one physician advisor will be consulted for the Plan's initial determination, and two more will supply their opinion during the appeal of an initial disability determination. In reviewing Plaintiff's applications for disability benefits, the Plan consulted seven physicians: Drs. Robbie, Garcia, Jamie

Lee Lewis, Friedman, Rangaswamy, Grattan, and Moshe Lewis. The contents of these physician advisors' assessments are discussed below.

### III. LEGAL STANDARD TO REVIEW A DENIAL OF EMPLOYMENT BENEFITS

Under the Employee Retirement Income Security Act ("ERISA"), a plan participant may sue in federal court "to recover benefits due to him under the terms of his plan" or to "enforce his rights under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). A denial of benefits in an ERISA case is reviewed under an arbitrary or capricious standard if the plan's administrator is given "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).[1] In this case, Sedgwick determines eligibility for the Plan's disability benefits, therefore the arbitrary or capricious standard applies.

In an ERISA denial of benefits case, "the ultimate issue . . . is not whether the discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002). "The arbitrary or capricious standard is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on

---

[1] The parties agree that the standard of review applicable to Plaintiff's claim is, indeed, the arbitrary and capricious standard. ECF No. 15 at 2 (Pg. ID No. 37).

-5-

the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989).

Though the standard is extremely deferential, it is not "without some teeth". *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064–65 (internal quotations omitted). In disability cases, plan decisions that: (1) ignore favorable evidence; (2) selectively review evidence; (3) disagree with a treating physician without conducting an independent physical examination; and/or (4) heavily rely on paid or contracted consultants, raise questions about whether a benefit plan engaged in a deliberate and principled reasoning process. *See Shaw v. AT&T Umbrella Ben. Plan No. 1*, 795 F3.d 538 (6th Cir. 2015). No factor alone is dispositive, but when taken together, they can support a finding that a benefits plan acted arbitrarily and capriciously. *Id.* at 551.

When reviewing a plan's decision to deny employment benefits, a court may consider only the evidence available to the administrator at the time the final decision was made. *McClain*, 740 F.3d at 1064.

## IV. DISCUSSION

The Court's review begins with an analogous case from the Sixth Circuit, *Shaw v. AT&T*. Next the Court applies the arbitrary or capricious standard, set forth in *Shaw*, to the totality of Plaintiff's medical evidence. Finally, based on precedent, the Court makes its conclusions with respect to each of the Plaintiff's claims.

### A. *Shaw v. AT&T*

The strongest authority cited by the Plaintiff is *Shaw v. AT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538 (6th Cir. 2015) (remanding Eastern District of Michigan Judge Judith Levy's grant of summary judgment for the Plan).[2] In *Shaw*, the Sixth Circuit tackled an extremely similar denial of disability benefits under the ERISA arbitrary or capricious standard. Compared to the immediate case, *Shaw* involves a similar injury (chronic neck pain in *Shaw*, versus chronic back pain here), the same employee occupation (customer service representative), the same employer (Michigan Bell), the same benefits program (AT&T Midwest Disability Benefits Program), the same benefits administrator (Sedgwick), and even some of the same physician advisors (Dr. Garcia and Dr. Jamie Lee Lewis). *Shaw*, 795 F.3d at 541–46. Furthermore, the Plan's reason for denial of benefits is the same in both cases: insufficient objective medical evidence to support that the employee was disabled. *Id.*

The panel, with Judge Kethledge dissenting, held that the plan administrator acted arbitrarily and capriciously in denying long-term disability benefits to Shaw. The *Shaw* panel based its holding on four findings: (1) the Plan administrators ignored favorable evidence from Shaw's treating physicians; (2) the Plan selectively reviewed evidence from treating physicians; (3) the Plan failed to conduct its own

---

[2] The Defendant does not distinguish or even mention *Shaw* in any of its materials.

physical evaluation; and (4) the Plan relied heavily on non-treating physician advisors. *Id.* at 548–51. *Shaw* provides guidance in the immediate case.

> *B. Applying the Arbitrary or Capricious Standard, in Shaw, to the Plaintiff's Medical Evidence*
>
> *1. Ignoring Favorable Evidence from Treating Physicians*

In *Shaw* the Sixth Circuit held that the Plan improperly ignored favorable evidence by: (i) making a factually incorrect assertion that the plaintiff did not submit certain evidence to the Plan, (ii) contradicting a treating physician without giving any reason for rejecting her conclusions, and (iii) only allowing treating physicians twenty-four hours to respond to requests for information before making a determination based only on a medical file. *Id.* at 548–49. In this case, the Plan ignored favorable evidence in the same three ways it did in *Shaw*.

*First*, in rejecting Plaintiff's Claim No. 2, the Plan stated "there was no evidence in the medical record of a functional impairment" and "no measurable objective findings to support disability." ECF No. 17-4 at 62–63 (Pg. ID 538). However, Plaintiff's medical records provide just such information. Dr. Carley's Initial Physician Statement listed "no work" as a functional restriction. ECF No. 17-5 at 96 (Pg. ID 637). In the same statement, Dr. Carley's observed clinical findings noted that the Plaintiff was "unable to ambulate". *Id.* Therefore, by stating that the Plaintiff lacked evidence of functional impairment or finding to support disability,

the Plan made factually incorrect assertions about the evidence that Plaintiff submitted from Dr. Carley.

*Second*, in rejecting Claim No. 3, the Plan improperly contradicted a treating physician without giving reasons. "[A] plan may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion." *See Shaw*, 795 F.3d at 548–49 (citing *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613. 620 (6th Cir. 2006)). In *Shaw*, the Plan ignored conclusions from two doctors who noted that Shaw could only walk for 10 minutes, sit for 20 minutes, and stand for 30 minutes. *Id.* Similarly, in this case, the Plan rejected the opinions of a treating physician without giving any reasons. Dr. Moshe Lewis, a reviewing physician, acknowledged that "[the Plaintiff] has restrictions of breaks every 5 minutes, no sitting or standing no more than 5-10 minutes, no heavy lifting over 2lbs, and no reaching over head, bending, or twisting." ECF No. 18-4 at 63 (Pg. ID 1150). Incredibly, without stating a single reason for adopting an alternative opinion, Dr. Moshe Lewis's next sentence summarily concludes that "[h]owever, from a [physical medicine and rehabilitation perspective], [the Plaintiff] is capable of *any* work and can complete her sedentary job without restriction." *Id.* (emphasis added). By not stating any reasoning for adopting Dr. Moshe Lewis's opinion over Dr. Carley's opinion, the Plan failed to demonstrate deliberate and principled reasoning.

*Third*, The Plan ignored favorable evidence from Plaintiff's treating physicians "by failing to make a reasonable effort to speak with them." *See Shaw* 795 F.3d at 549. In *Shaw*, the Plan's physician advisors attempted to contact Shaw's treating physicians. However, "they gave the treating physicians only 24 hours to respond to their requests before they made their disability decisions based on available medical information." *Id.* Twenty-four hours is an "unreasonable deadline". *Id.* "[A]lthough persons conducting a file review are not per se required to interview the treating physician . . . the cursory manner in which the Plan attempted to contact Shaw's treating physicians is evidence that the Plan's decision was not the result of a deliberate, principled reasoning process." *Id.* (citing *Helfman v. GE Grp. Life Assurance Co.*, 573 F.3d 383, 393 (6th Cir. 2007) and *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 444 (6th Cir. 2009). Similarly, in this case, the Plan's physician advisors gave treating physicians only 24 hours to respond to telephone requests. *See* ECF No. 17-1 at 152 (Pg. ID 202) (demonstrating a 24-hour response period in reviewing Claim No. 1); ECF No. 17-4 at 55 (Pg. ID 530) (demonstrating a 24-hour response period in reviewing Claim No. 2); ECF No. 18-4 at 62 (Pg. ID 1149) (demonstrating a 24-hour response period in reviewing Claim No. 3). Sometimes the treating physicians could meet this unreasonable deadline.[3]

---

[3] Only three of the total seven reviewing doctors made contact with a treating physician. In Claim No. 1, two of the three reviewing doctors spoke with two treating physicians. In Claim No. 2, one of the three reviewing physicians spoke with a

-10-

Nevertheless, it was the "cursory manner" of contact and the haste to complete the review that concerned the Sixth Circuit in *Shaw*. Therefore, because the Plan again failed to make a reasonable effort to speak with treating physicians, its behavior raises questions about its reasoning process.

### 2.  *Selectively Reviewing Evidence from Treating Physicians*

"An administrator acts arbitrarily and capriciously when it engages in a selective review of the administrative record to justify a decision to terminate coverage." *See Shaw*, 795 F.3d at 549 (citing *Metro Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (internal quotations omitted).

Dr. Friedman, a reviewing physician for the Plan, engaged in a selective review of Plaintiff's Claim No. 2. Dr. Friedman noted that after "extensive evaluation," each of Plaintiff's treating physicians determined "her back pain to be of musculoskeletal origin." Nevertheless, Dr. Friedman concluded:

> Ms. Filthaut has no functional impairment *from the nephrology standpoint*[4] so it can be stated administratively that there is no disability *from the nephrology standpoint*. Notably, her attending physician, Dr. Carley agreed that there are no issues *from the nephrology standpoint* affecting her functional capacity/ability to work.

---

treating physicians. In Claim No. 3, the only reviewing physician did not speak to any treating physicians.

[4] "Nephrology, [the] branch of medicine concerned with the study of kidney functions and the treatment of kidney diseases." ENCYCLOPEDIA BRITANNICA 2016, *available at* https://www.britannica.com/topic/nephrology.

-11-

ECF No. 17-4 at 52–53 (Pg. ID 527–28). Dr. Friedman's review of evidence is selectively narrow. Despite acknowledging that the source of Plaintiff's injury lies in her muscles and bones, Dr. Friedman based his decision on the Plaintiff's kidneys—which are not part of the musculoskeletal system.[5]

Even worse, the Defendant misinterprets, then overgeneralizes Dr. Friedman's conversation with Dr. Carley. Dr. Friedman is a nephrology specialist. *Id.* His review of the evidence, his ultimate conclusion, and the report of his conversation with Dr. Carley was limited to nephrology. *Id.* Dr. Friedman makes this explicit because in his brief, two-sentence rationale, Dr. Friedman uses the signal "from the nephrology standpoint" three times. *Id.* The Defendant ignores this signal. Instead, the Defendant incorrectly argues that Dr. Carley indicated that the Plaintiff was not disabled from *any* medical standpoint. *See* ECF No. 17-4 at 62 (Pg. ID 537) ("Plaintiff's Own Treater Indicated That She Was Not Disabled"). Dr. Friedman's selective review and the Plan's misinterpretation of Friedman's report suggest arbitrary and capricious decision-making.

---

[5] The musculoskeletal system is the combination of the muscular and skeletal systems working together and includes the bones, muscles, tendons, ligaments, fascia, and cartilage of the body. U.S. NATIONAL LIBRARY OF MEDICINE DATABASE: MUSCULOSKELETAL SYSTEM HEADING, *available at* https://www.nlm.nih.gov/cgi/mesh/2011/MB_cgi?mode=&term=Musculoskeletal+System.

*3. The Plan's Failure to Conduct its Own Physical Evaluation*

"[T]here is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician." *Calvert v. Firstar Fin. Inc.,* 409 F.3d 286, 297 n. 6 (6th Cir. 2005). However, the Sixth Circuit has held that the failure to conduct a physical examination, where the Plan document gave the plan administrator the right to do so, "raise[s] questions about the thoroughness and accuracy of the benefits determination." *Helfman,* 573 F.3d at 393 (quoting *Calvert,* 409 F.3d at 295). In *Shaw*, the Sixth Circuit held, "the Plan specifically reserved the right to conduct its own 'examination by a Physician chosen by the Claims Administrator, if the Claims Administrator determines that such an examination is necessary.'" *Shaw,* 795 F.3d at 550 (quoting language from the AT&T Midwest Disability Benefits Brochure). "However, the Plan's physician advisors failed even to attempt to conduct their own in-person evaluation of Shaw. This is especially troubling because the Plan's physician advisors second-guessed Shaw's treating physicians and made credibility determinations." *Id.* (internal citations omitted).

In this case, the AT&T Midwest Disability Benefits Program contained the exact same language, specifically reserving the Plan's right to conduct its own physical evaluation. *See* ECF No. 18-5 at 16 (Pg. ID 1203). However, the Plan again failed to conduct its own evaluation. Further, the Plan committed the same actions

-13-

that troubled the panel in *Shaw*. The Plan's physician advisors second-guessed Plaintiff's treating physician when it credited Dr. Moshe Lewis's assumption that Plaintiff is "capable of any work and can complete her sedentary job without restrictions" over Dr. Carley's recommendation that that Plaintiff take breaks every 5 minutes and does not stand or sit for more than 5-10 minutes. *See* ECF No. 18-4 at 64–68 (Pg. ID 1151–55). The Plan also made a credibility determination when it discounted Dr. Carley's reports of the Plaintiff's pain and restrictions, and instead argued that "Plaintiff Failed to Present Sufficient Medical Documentation Establishing That She Was Disabled." ECF No. 20 at 19. "However, without ever examining [the Plaintiff], the Plan should not have made a credibility determination about [the Plaintiff's] continuous reports of pain." *Shaw*, 795 F.3d at 550. "Because chronic pain is not easily subject to objective verification, the Plan's decision to conduct only a file review supports a finding that the decision-making was arbitrary and capricious." *Id.*

4. *Relying Heavily on Non-treating Physician Consultants*

"The Supreme Court has acknowledged 'that physicians repeatedly retained by benefits plans may have an incentive to make a finding of "not disabled" in order to save their employers money and to preserve their own consulting arrangements.'" *Elliott*, 473 F.3d at 620 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S.

822, 832). Dr. Jamie Lee Lewis's[6] conclusions have been questioned in numerous federal cases, all of which he was hired by Sedgwick. *Id.* "Therefore, Dr. [Jamie Lee] Lewis's track record further supports the conclusion that the Plan did not engage in a 'deliberate, principled reasoning process.'" *Id.* In this case, Dr. Jamie Lee Lewis reviewed Claim No. 1. Like the panel in *Shaw*, this Court looks at his conclusions with some skepticism.

### *C. Conclusion*

On this record, the Court concludes that the Plan's reasoning with regard to Dr. Carley's March 2014 reports was neither deliberate, nor principled. The Plan ignored Dr. Carley's favorable evidence by making factually incorrect statements, contradicting his assessment without reason, and by failing to make a reasonable effort to speak with him. Furthermore, when a reviewing doctor (Dr. Friedman) actually made contact with Dr. Carley, the reviewing doctor engaged in a selective review of Dr. Carley's evidence. Despite ignoring, selectively reviewing, or second-guessing Dr. Carley's reports, the Plan never exercised its right to conduct its own evaluation of the Plaintiff. Dr. Carley's March 2014 report was a part of the Administrative Record for Claim No. 2 and Claim No. 3. Therefore, the Court holds that the Plan's denial of benefits in Claim No. 2 and Claim No. 3 was arbitrary and capricious.

---

[6] Not to be confused with Dr. Moshe Lewis.

Although some of the Plan's decision-making regarding Claim No. 1 is questionable (i.e., relying on Dr. Jamie Lee Lewis's controversial analysis and failing to conduct its own examination of the Plaintiff), those acts are not flagrant errors because they predate Dr. Carley's March 2014 report. Therefore, this Court holds that the Plan did not act arbitrarily or capriciously in denying benefits in Claim No. 1.

## V. CONCLUSION

For the reasons discussed herein, the Court will **GRANT** Plaintiff's Motion for Summary Judgment [21] as to Claim Nos. 2 and 3 and **DENY** Plaintiff's Motion for Summary Judgment as to Claim No. 1. It is further ordered that the Defendant's Motion for Judgment on the Administrative Record [20] be **GRANTED** with respect to Claim No. 1 and **DENIED** as to Claim Nos. 2 and 3.

**SO ORDERED.**

Dated: November 7, 2016

Detroit, MI

/s/Gershwin A Drain
HON. GERSHWIN A. DRAIN
United States District Court Judge

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, November 7, 2016, by electronic and/or ordinary mail.

/s/Tanya Bankston
Case Manager, (313) 234-5213